UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Criminal No. 25-CR-40040-MRG |
| ADAM GENTILE | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government respectfully submits this memorandum in support of its sentencing recommendation for the defendant, Adam Gentile. Over a period of approximately nine years Gentile stole approximately $7.8 million by earning and then abusing the trust placed in him by two physicians' groups, each of whom made clear they needed and relied on Gentile to run the business of their medical practices. Rather than faithfully supporting that mission, Gentile sought to enrich himself by taking control of the practices' financials. Specifically, he changed the payroll provider, took over insurance provision, and ran billing and purchasing through himself. Gentile used this control to (1) pay himself more than his monthly salary through bogus bonuses and extra paychecks, and (2) pay his personal credit card bills by claiming he was fronting the practices money for good and services then reimbursing himself. He used the proceeds of his crime to purchase and renovate large homes, purchase then lease multiple luxury cars, and take himself and his family on lavish vacations. Meanwhile, each practice at various times struggled to make payroll – the first practice through the Covid pandemic, and the second through a period of transition from their long-time office manager. All told, Gentile's greed and grift cost Victim 1 over $3.8 million and Victim 2 over $3.3 million.

The government respectfully submits that a period of five years' incarceration followed by three years of supervised release and an entry of restitution and forfeiture orders as set forth in the parties' plea agreement serves the sentencing goals of specific and general deterrence and seeks to put the victims in as good a position as possible given the damage done by Gentile's actions. Although Gentile largely appears to have squandered his ill-gotten riches, the victims deserve to be made whole as much as possible over the course of Gentile's sentence, and a period of incarceration is necessary to properly protect the public and deter Gentile and others from committing these crimes in the future.

**Procedural History**

On December 3, 2025, Gentile was charged by Information with three counts of wire fraud, in violation of 18 U.S.C. § 1343. ECF No. 1. On December 12, 2025, the government filed an assented-to motion for a Rule 11 hearing, and the Court set the hearing for February 24, 2026. ECF No. 3 and 4. On February 5, 2026, the government filed the parties' signed plea agreement. ECF No. 12. On March 31, 2026, Gentile waived Indictment and pleaded guilty to all three counts of the Information. ECF Nos. 7, 13, 16. At the Rule 11 hearing, the government agreed the defendant would remain on release on conditions, and the Court set sentencing for July 16, 2026. On June 23, Gentile filed a motion to continue the sentencing, which the government opposed. ECF Nos. 23, 24. The Court denied the motion, agreeing that any report date could be in September to accommodate the defendant's request, but that the hearing should otherwise go forward. ECF No. 25. On July 8, 2026, a week before the originally scheduled sentencing, prior counsel moved to withdraw as Gentile's attorney. ECF No. 27. The motion was allowed and the sentencing was taken off the calendar. ECF No. 32. Current counsel was appointed and the Court reset sentencing for August 27, 2026. ECF Nos. 33, 35.

## I. FACTUAL BACKGROUND

In or around 2014, Victim 1, an anesthesiology practice located near Boston, hired Gentile as an administrative assistant. Victim 1 subsequently promoted the defendant to the role of office manager. In his capacity as office manager, Gentile switched the payroll processor to Paycor, Inc. He also processed payroll for Victim 1, including his own payroll. No one else at Victim 1 exercised regular oversight over the practice's payroll. Gentile also handled supply purchasing and bill pay. Beginning in or around 2015, and continuing through in or about November 2020, the defendant embezzled approximately $4.5 million from Victim 1. Using his control over the payroll, Gentile would issue himself extra paychecks and fake "bonuses." In addition, Gentile used Victim 1's bank account to pay his substantial personal American Express credit card bills.

These types of extra payments and fraudulent credit card repayments, in the thousands of dollars per payment, continued over the course of his employment until it was partially discovered by Victim 1. Upon the practice discovering a portion of the fraud, Gentile admitted to the conduct and agreed to a repayment plan. When Victim 1 became aware of the full amount of the fraud, a loss amounting to $4.5 million, Victim 1 terminated Gentile. Gentile repaid to Victim 1 a portion of the stolen funds but stopped making payments at or around the time he was terminated by Victim 2. As set forth below, the defendant used some of the funds he stole from Victim 2 to repay Victim 1.

From on or about April 20, 2021, through in or about May 2024, Victim 2, a pediatrician's office located in Leominster, Massachusetts, employed Gentile as the practice's office manager. Gentile provided references when he was interviewed for the job with Victim 2, including an individual he claimed to represent Victim 1, but did not actually provide a reference from any of the doctors who were aware of his prior fraud.

In his capacity as the office manager for Victim 2, Gentile had sole responsibility for processing the practice's payroll. He also was responsible for revenue recording, financial reporting, vendor payments, and insurance. As he did with Victim 1, Gentile convinced the pediatrician's practice to switch its payroll processor, which Gentile controlled. Gentile told the practice partners that Paylocity would be less expensive than their old processor, ADP, and that he (Gentile) would handle all the extras that ADP had provided (e.g. payroll, insurance and some HR functions). Gentile also took over insurance procurement for the practice and purchased employee theft protection as he undertook his own theft from the practice.

From in or around April 2021 through in or around May 2024, Gentile stole more than $3.3 million from Victim 2. Gentile used the proceeds of his crime to buy and renovate a new home. He used one such payment to cover the downpayment. Gentile also ran a side business buying cheap furniture and "flipping" it (i.e., making changes then reselling it for more money) on Amazon, which he funded with stolen money from Victim 2's bank account. Just like with Victim 1, Gentile also used the pediatrician's bank account to pay off his personal credit cards. Many of the charges he paid for were payments to renovation and design contractors who were doing work on the home he purchased, also with stolen funds. Gentile also funded the purchase and lease of luxury cars including Mercedes and two Porsche Cayennes.[1]

Gentile also took steps to conceal his fraud. Many of the credit card charges he made and subsequently paid off with his employer's money were in the amount of approximately $20,000. The amount of this payment was not coincidental. Victim 2 ordered its medical test kits from a supply company called Henry Schein. The cost of a typical order of kits was approximately $20,000. When partners at Victim 2 began questioning Gentile about some of his accounting, he

[1] A Porsche Cayenne in 2026 has a starting price of approximately $89,000. *See* https://www.porsche.com/usa/models/cayenne/.

told them that the payments to his AmEx accounts of approximately $20,000 were reimbursement for his ordering test kits with his own money. Gentile told the partners that Henry Schein would not let the practice order the number of kits it needed, i.e. it placed a cap on the dollar amount the practice could owe at any one time. So, Gentile told the partners, he (Gentile) placed the excess orders with his own money. In fact, but for a couple of such payments made to Henry Schein, the payments to Gentile's AmEx accounts were to pay off his personal credit card expenses. In addition, upon inquiry, the partners learned that the practice was actually in debt to Henry Schein in the amount of approximately $200,000.

By the time Victim 2 realized what Gentile was doing, he had stolen approximately $3.3 million. All told, over approximately 9 years, Gentile stole a total of approximately $7.8 million. According to a statement he made under oath in his personal bankruptcy proceeding, a copy of which is publicly available, he spent the vast majority of this this money on "furniture, cars, home renovations, lots of purchases, [and] vacations."

In or around May 22, 2025, the government sent a letter to Gentile's then attorney alerting him to this investigation. In December 2025, the parties agreed to the plea agreement filed in this case, ECF No. 12. Pursuant to the agreement, the government agreed to recommend a guidelines sentence of incarceration and a period of 36 months' supervised release. Gentile agreed to jointly recommend that the Court enter an order of restitution in the amount of $3.8 million as to Victim 1 and $3.3 million as to Victim 2. Gentile further agreed that the proceeds from the sale of the home he purchased with stolen funds, described above, would be forfeited and that the Court would enter an order of forfeiture (money judgment) in the amount of $7.8 million.

## II. ADVISORY SENTENCING GUIDELINES

The PSR found that Counts One through Three group. PSR ¶ 30. Pursuant to U.S. Sentencing Guidelines (“USSG”) § 2B1.1(a)(1), the base offense level is 7 because the offense of wire fraud carries a statutory maximum term of imprisonment of 20 years or more. *Id.* ¶ 31. The offense level is increased by 18 because the loss is more than $3,500,000 but less than $9,500,000. *Id.* ¶ 32. The offense level is increased by two points for abusing his position of trust as the manager of each of the victim practices. *Id.*¶ 34. As set forth in the parties’ plea agreement, the government would add two additional points based on the sophisticated means used by Gentile in carrying out his fraud – namely the takeover of the practices’ operations, the structuring of payments to AmEx to appear to be for practice materials, and the subterfuge employed to carry out his $7.8 million theft. ECF No. 12, ¶ 3.[2] The government, therefore, would calculate the combined adjusted offense level to be 29. *Id.* ¶ 36. With a three-level reduction for Gentile’s acceptance of responsibility, the government calculates the total offense level as 26. *Id.* ¶ 40. Based on a total offense level of 26 and a criminal history category of II, Gentile’s guideline imprisonment range is 70-87 months. Although two levels higher than probation’s calculation, even were the Court to adopt probation’s calculation of 57 to 71 months, the government’s recommendation would be the same. *Id.* ¶ 83. There is no mandatory minimum sentence applicable.

[2] The government initially calculated the defendant’s criminal history score as zero but agrees that the convictions identified by probation result in a score of 2, making the defendant ineligible for the zero-point offender reduction.

## III. SENTENCING FACTORS

A. Nature of the Offense

The scope of Gentile's crimes – both the length of time over which he committed the crimes and the amount of loss to the victims – supports the government's recommendation of a term of incarceration of 60 months to be followed by 36 months of supervised release.

First, Gentile's scheme was long ranging. Gentile carried out his fraud for almost five years before being discovered by Victim 1. Then, even after facing the consequences of his actions, yet avoiding more serious consequences, Gentile went on to commit fraud against a new victim for an additional three years. Furthermore, the defendant committed this fraud after receiving state CWOFs, second chances in and of themselves, for three instances of larceny by check. PSR § 43-44, 46. By the time the defendant stands before this Court, he will have faced almost no consequences for his fraudulent actions for over a decade.

Second, the amount of money Gentile embezzled merits a serious punishment. In the midst of the Covid pandemic and from a position of significant trust, Gentile took approximately $4.5 million from Victim 1. That is a significant amount of money in any circumstance. However, in the context of Gentile's actions as the Covid pandemic took hold, the amount is even more impactful. For medical practices dependent upon surgeries, the pandemic shutdown was often devastating. In fact, it was the squeeze caused by the pandemic that led the defendant's theft to become so apparent. But for the pandemic hitting when it did, it is possible Gentile's fraud may have continued for years unabated.

Gentile's actions with respect to Victim 1 were criminal, significant, and worthy of a significant sentence standing on their how. But, the nature of his crime against the second victim – after being discovered and given a second chance by Victim 1 – is perhaps even more egregious.

Victim 1 gave Gentile the opportunity to redirect his life, however, the defendant didn't only double down on his greed, he victimized another practice in part to pay his first victim. Gentile sought out a practice he could control and victimize to save himself and the deal he made with his first victim. He found such a victim in the tight-knit pediatricians' practice in Leominster, and intentionally undertook a scheme to defraud the practice, hide it, and continue to enrich himself. The crimes to which Gentile pled guilty and for which he must be sentenced are serious and the impact on the victims, as set forth in each practice's statement, was significant.

B. Characteristics of the Defendant and Need for Deterrence

Gentile's repeated pattern of behavior – not only his actions underlying the crimes in this case, but also his criminal history, open civil cases, and concerning statements made in his bankruptcy case[3] – seriously concerns the government and presents the need for a strong deterrent against future fraudulent behavior. Gentile, by all accounts including his own in the PSR, had an upbringing that was privileged relative to many individuals who find themselves before the Court. His mother, an engineer, and his father, a finance professional, gave him and his brother a supportive upbringing. He had the opportunity to attend college, but did not finish following his father's passing. Nonetheless, he secured good and gainful employment with the first practice at which he worked. He made $150,000 a year with the opportunity for five-figure bonuses. The defendant, by most objective measures, was set up for success – perhaps not a life of ease, but one of opportunity and security.

[3] There were small claims court cases pending against Gentile for writing bad checks to various vendors, at the time he filed his personal bankruptcy. *See* e.g., 2567SC00470, 471, and 473EF (pending in Westborough District Court); 2549SC001674 (pending in Framingham District Court). Contrary to Gentile's representation to the bankruptcy trustee in a recent public hearing, the government did not know about nor approve his filing of that case.

Gentile, however, wanted more. He wanted to live a life of luxury. He has admitted as much. Instead of working hard and saving, and providing for his family with the good income he earned, he began to steal from his employer. The defendant lived in a large, well-appointed home, drove luxury cars, purchased flashy items to wear and to give away as gifts to show off his largess. He curated an image of himself and his family on social media, taking lavish vacations and posting photographs. But, like many fraudsters, it was a mirage. Gentile's wealth was stolen. And when his first employer caught him, he admitted as much and promised to make them whole – by pledging existing assets and establishing a repayment plan based on his honestly earned income.

Instead of taking the opportunity to redirect his life, he moved on to the next victim so he could repay victim 1 while continuing to live the lifestyle he preferred. He took the job with Victim 2 for the specific purpose, hidden of course from his new employer, of setting up a new fraud at a new unsuspecting victim. And Gentile did just that. He continued to make lavish purchases; he continued to fund his side businesses and home renovations, all while stealing $3.3 million from a this small pediatric practice. The effect on the practice, as set forth in the victim impact statement, was significant. What makes this behavior so appalling is not only the premeditation, but that Gentile could see the effect on the practice. He could see the toll his mismanagement and theft were having on the practice's books and accounts. While telling the doctors he was fronting payments to one of the practice's medical suppliers, he actually was paying himself while neglecting to pay the supplier, resulting in a deficit of hundreds of thousands of dollars. As he lived in luxury, he slowly sent the doctors toward financial peril.

The pattern of fraud and intentional harm that the defendant caused to these victims, the fact that he has a history of fraudulent behavior, and the fact that he continues to believe he can pay or not pay, or tell half truths as it suits him, suggests there is a real and significant need for a

sentence that promotes deterrence specific to this defendant as well as generally. The government regrets deeply that the defendant's decisions have and will continue to negatively impact his children and likely other existing relationships. It is almost always the most tragic and unfair consequence of criminal behavior. But this defendant was given a second chance in 2020 and explicitly chose to continue defrauding others to enrich himself. He is responsible for the position in which he finds himself and and the government respectfully submits that a serious sentence of 60 months' incarceration is not greater than necessary to ensure safety to the public from his actions, deterrence, and to satisfy the remainder of the 3553(a) factors.

## CONCLUSION

For all the reasons set forth in this memorandum, based on the uncontested facts of the PSR, and in consideration of the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends the Court impose a sentence of 60 months' incarceration to be followed by 36 months of supervised release and requests the Court allow the government's preliminary motion for forfeiture and enter and order of restitution as proposed by the parties.

Respectfully submitted,

LEAH B. FOLEY
UNITED STATES ATTORNEY

By: *<u>/s/ Kaitlin J. Brown</u>*
Kaitlin J. Brown
Assistant U.S. Attorney
Kaitlin.brown@usdoj.gov

Dated: August 20, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Kaitlin J. Brown
Kaitlin J. Brown
Assistant U.S. Attorney

Date: August 20, 2026